## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ROBERT BROWN, III, RAYMOND B.
ROBINSON, JR., VICTOR LAGOMBRA,
NORRIS DOUGLAS, EKILISANDRO
TEIXEIRA, CRAIG C. NELSON,
ANDERSON BUCKMIRE, RASHEED HALL,
ANTHONY DINGLE-JONES, BATRON
SULLIVAN, HENRY CLAY, TIMOTHY
BROWN, JAMES COAKLEY, KASHIF
BROWN, SHAWN BROWN, MARC C.
HOLLAND, SHAWN ANDREWS, TROY
JOHNSON, MICHAEL E. COOPER,  KARIM
BLOUNT,

*INDIVIDUALLY, AND ON BEHALF OF
ALL OTHER SIMILARLY SITUATED
INDIVIDUALS,*

  *PLAINTIFFS,*

v.

CLOVER FAST FOOD, INC., (d/b/a and a/k/a
CLOVER FOOD LABS), AYR MUIR,
MEGAN PILEGGI f/k/a MEGAN
PEDERSON, AND CHRISTOPHER
ANDERSON

  *DEFENDANTS.*

## VERIFIED COMPLAINT

## INTRODUCTION

This complaint is brought on behalf of Plaintiffs, Robert Brown, III ("Brown"), Raymond B. Robinson, Jr. ("Robinson"), Victor Lagombra ("Lagombra"), Norris Douglas ("Douglas"), Ekilisandro Teixeira ("Teixeira"), Craig C. Nelson ("Nelson"), Anderson Buckmire ("Buckmire"), Rasheed Hall ("Hall"), Anthony Dingle-Jones ("Dingle-Jones"), Batron Sullivan ("Sullivan"), Henry Clay ("Clay"), Timothy Brown ("Timothy Brown"), James Coakley ("Coakley"), Kashif Brown ("K. Brown"), Shawn Brown ("S. Brown"), Marc C. Holland ("Holland"), Shawn Andrews

("Andrews"), Troy Johnson ("Johnson"), Michael C. Cooper ("Cooper"), and Karim Blount ("Blount") individually, and on behalf of all similarly situated individuals (collectively, "Plaintiffs"), all of whom are current or former employees of the Defendant, Clover Fast Food, Inc., d/b/a Clover Food Labs ("Clover").

Plaintiffs bring this action to assert their common claims against Clover arising out of its pattern and practices of discrimination against the Plaintiffs, on the basis of their race, ethnicity, and/or national origin. The claims asserted herein relate to the terms and conditions of Plaintiffs' employment, and the specific acts and practices to which such claims are directed are or were engaged in, on behalf of Clover, by its individual directors, officers, managers, or agents -- namely, the individual Defendants, Ayr Muir ("Muir") and Megan Pileggi f/k/a Megan Pederson ("Pileggi") and Chris Anderson ("Anderson").

Clover, through Muir, Pileggi and Anderson, have utilized discriminatory employment practices, which included, without limitation: (a) assigning minority employees to work in Clover's Operations Department, wherein the working conditions are or were substantially worse than those within any other department of Defendant's enterprise, and which conditions include, without limitation, excessive heat, poor ventilation, rodent and insect infestation, and the like; (b) failing or refusing to rectify the poor working conditions within the Operations Department, despite receiving complaints regarding same from the minority employees assigned to work therein; (c) compensating its minority employees at lower hourly rates than those paid to Clover's non-minority employees; (d) manually reducing the number of hours of work recorded by minority employees (or by the department manager responsible for logging the hours of work performed by that departments employees, on their behalf), by adjusting the hours logged in the Defendants' time-keeping system, and, as a result of such adjustments of work hours, (e) failing to compensate these minority employees for each and every hour of work performed by them, including both regular-work hours and overtime-work hours.

Moreover, the Plaintiffs bring this action to assert claims against the Defendants arising out of its acts and practices that have a disparate impact upon Clover's minority employees, on the basis of their race, ethnicity and/or national origin. Specifically, Clover, through Muir, Pileggi and Anderson, engages in the practice of soliciting new employees from one or more federal halfway houses, thereby hiring individuals who, necessarily, have criminal records or who otherwise have been convicted of one or more federal criminal charge. The Defendants engage in disparate impact

discrimination by, inter alia, (a) assigning these new employees to work in the Operations Department, wherein the working conditions are or were substantially worse than the conditions in any other department; (b) compensating these employees at hourly rates which are lower than the rates paid to those employees who do not have criminal records or histories, and (c) imposing upon such new employees other terms or conditions of their employment that are different and worse than the terms or conditions of its employment of those employees who are not hired as a result of Defendants' practice of soliciting employment from federal halfway houses.

By seeking out and hiring employees with criminal records or who have otherwise been convicted of federal crimes, and imposing upon them terms and conditions of employment which are worse than those afforded to Clover's other employees, the Defendants' employment and hiring practices have a disparate impact upon employees of color, on the basis of their race, ethnicity, and/or national origin.

There is no fair or legitimate purpose, nor any bona fide occupational qualification, for the Defendants' acts and practices described herein. Such acts and practices, instead, constitute and represent a pattern or series of both intentional (disparate treatment) discrimination, and indirect (disparate impact) discrimination, on the basis of Plaintiffs' ethnicity, race, and/or national origin, in violation of both Federal and state law.

Finally, the Plaintiffs are herein asserting additional claims arising out of and directed towards (A) Defendants' regular and deliberate failure to pay the Plaintiffs all of the regular-time and overtime wages earned by them, and (B) Defendants' regular practice of deducting the cost of its employee uniforms from Plaintiffs' compensation, which reduces the compensation paid to such employees to sums below the state minimum wage.

## Brown's Individual Claims

In addition to the foregoing, the Plaintiff, Brown, brings this action in order to assert his individual claims against the Defendants, arising out of his employment with Clover during the period from on or about September 28, 2012, through the date upon which he was terminated by the Defendants, on August 28, 2014.

Specifically, during Brown's period of employment, the Defendants engaged in discriminatory acts and practices, on the basis of his race and national origin, which acts and practices related to the terms and condition of his employment, including, without limitation, (A)

compensating Brown differently than the manner in which the Defendants compensate all other department managers, which amounted to substantially lower compensation than that which the Defendants paid to all other department managers; (B) refusing to provide Brown with certain employment benefits provided to all other department managers, and (C) prohibiting Brown from attending any and all department manager activities and events (i.e., certain activities and events organized for and attended by department managers only).

Shortly after his termination on or about August 28, 2014, the Defendants replaced Brown with one of its white (non-minority) employees, who is or was paid significantly more than the Defendants paid Brown for performing the same work, and despite her being substantially less qualified than Brown, and having significantly less experience than he did at the time he was hired.

Brown is herein asserting additional individual claims arising out of his termination by the Defendants, which was undertaken in retaliation for Brown's engaging in certain protected activities, including, (A) complaining to Pileggi, Muir and/or Anderson regarding the terms and conditions of his employment and his compensation; (B) relating to Pileggi, Muir and/or Anderson the complaints raised to him by the Plaintiffs regarding Defendants' repeat failures to pay them for all regular and overtime hours of work they performed; (c) reporting or complaining to Pileggi, Muir and/or Anderson that the working conditions within the Operations Department were becoming unbearable, and, finally, (d) reporting his concerns about the health and safety conditions within the Operations Department to both the Massachusetts Board of Health, and the Occupational Safety and Health Administration ("OSHA"), in August of 2014.

## Robinson's Individual Claims

The Plaintiff, Robinson, also has individual claims against the Defendants, similarly relating to his employment with Clover, which began in or around October, 2012, through the date of his termination in or around the fall of 2014. Robinson is a black American male, and he worked in the Operations Department of Clover, as a dishwasher.

During Robinson's period of employment, the Defendants engaged in discriminatory acts and practices against him, on the basis of his race and national origin, and relating to the terms and condition of his employment, including, without limitation, offering to promote Robinson to the position of Operations Manager, in late-August or early-September, 2014, immediately after the position became available as a result of Brown's termination, but for which the Defendants intended

to compensate Robinson at an hourly rate substantially lower than that which the Defendants had paid to Brown for the same work. After Robinson turned down the offer, the Defendants assigned the position to one of their white (non-minority) employees. After she became the Operations Manager, the Defendants compensated this employee on a salary basis, which amounts or amounted to significantly more than the compensation they offered to Robinson for performing the exact same work, and for which Robinson was more qualified.

Robinson also brings this action to assert claims against the Defendants arising out of his termination by the Defendants in retaliation for Robinson's engaging in certain protected activities, including, without limitation, (A) complaining to the Defendants about his compensation, and the other terms and conditions of his employment, and (B) filing a complaint with both the Equal Employment Opportunities Commission ("EEOC"), and the Massachusetts Commission Against Discrimination ("MCAD") alleging therein that the Defendants have a pattern and practice of discriminating against their employees, on the basis of their races, ethnicities and/or national origins.

## Jurisdiction and Venue

1.     This Honorable Court has subject matter jurisdiction of all Counts, pursuant to 28 U.S.C.§ 1331 and 29 U.S.C. § 216(b), as the matter in controversy arises under the Constitution and laws of the United States.

2.     The Honorable Court has subject matter jurisdiction of all Counts pursuant to 28 U.S.C. § 1367 et seq. and 28 U.S.C. § 1343 et seq.

3.     Defendant Clover has its principal place of business in this District at 988 Memorial Drive, Suite 181, Cambridge, Massachusetts and is therefore subject to personal jurisdiction.

4.     Defendants Muir and Pileggi reside in this District at 1 Meadowbrook Road, Lincoln, Massachusetts, and 24 Grand View Avenue, Apartment 2, Somerville, Massachusetts, respectively, and are all therefore subject to personal jurisdiction here.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as the Defendants reside in this District and are subject to personal jurisdiction in this District. All of the events and conduct giving rise to the violations of the law complained of herein occurred in this District.

6.     This court has supplemental jurisdiction over the claims brought under M.G.L. c. 151B as granted by 28 U.S.C. 1367(a) because of the claims under the state law are so related to the Federal claims brought herein that they form the same case or controversy under Article 3 of the U.S. Constitution.

7.     Plaintiff Brown filed these charges of discrimination and retaliation with the Massachusetts Commission Against Discrimination ("MCAD") and Equal Employment Opportunity Commission ("EEOC").    The actions that compose Plaintiff Brown's MCAD and EEOC charges occurred within 300 days of said entity and EEOC charges.

8.     The EEOC issued a denial of claims letter, providing the Defendant Brown the right to sue.  This suit is brought within 90 days of receipt of the right to sue issued by the EEOC, as required by Title VII. The EEOC never held any hearing on Plaintiff Brown's charges. Plaintiff Brown is entitled to de novo review in this court.

9.     The MCAD issued a denial of claims letter, providing the Defendant Brown the right to sue.  The MCAD never held any hearing on Plaintiff Brown's charges. Plaintiff Brown is entitled to de novo review in this court.

10.     Pursuant to 42 U.S.C. 1981 a, 42 U.S.C. section 2000 e-, 42 U.S.C. section 2000 e-et seq. and M. G. L. c. 151B, this court has the ability to award damages as requested herein.

## PARTIES

11.     The Plaintiff, Brown, is a Black-American individual residing at 308a Talbot Avenue, Boston, Suffolk County, Massachusetts.

12.     The Plaintiff, Robinson, is a Black-American individual residing at 102 Robey Street, Apartment 1, Boston, Suffolk County, Massachusetts.

13.     The Plaintiff, Lagombra, is a Black-American individual residing at 10 Buckwell Street, Apartment 5G, Boston, Suffolk County, Massachusetts.

14.     The Plaintiff, Douglass, is a Black-American individual residing at 73 Walford Way, Charlestown, Suffolk County, Massachusetts.

15.     The Plaintiff, Teixeira, is a Black-American individual residing at 380 Ashmont Street, Boston, Suffolk County, Massachusetts.

16.     The Plaintiff, Nelson, is an individual residing at 32 Morgan Lane, Norton, Bristol County, Massachusetts.

17.     The Plaintiff, Buckmire, is a Black-American individual residing at 106 Camden Street, Boston, Suffolk County, Massachusetts.

18.     The Plaintiff, Hall, is a Black-American individual residing at 21 Concord Square, Boston, Suffolk County, Massachusetts.

19.     The Plaintiff, Dingle-Jones, is a Black-American individual residing at 20 Merriam Street, Apartment 1, Somerville, Middlesex County, Massachusetts.

20.     The Plaintiff, Sullivan, is a Black-American individual residing at 8 Violet Street, Boston, Suffolk County, Massachusetts.

21.     The Plaintiff Clay is an individual residing in Massachusetts.

22.     The Plaintiff Timothy Brown is an individual residing in Massachusetts.

23.     The Plaintiff Coakley is an individual residing in Massachusetts.

24.     The Plaintiff Kashif Brown is an individual residing in Massachusetts.

25.     The Plaintiff Shawn Brown is an individual residing in Massachusetts.

26.     The Plaintiff Marc C. Holland is an individual residing in Massachusetts.

27.     The Plaintiff Shawn Andrews is an individual residing in Massachusetts.

28.     The Plaintiff Troy Johnson is an individual residing in Massachusetts.

29.     The Plaintiff Michael C. Cooper is an individual residing in Massachusetts.

30.     The Plaintiff Karim Blount is an individual residing in Massachusetts.

31.     The Defendant, Clover, is a Delaware corporation having its principal place of business located at 7 Holyoke Street, Cambridge, Middlesex County, Massachusetts.

32.     The Defendant, Muir, is an individual residing at 1 Meadowbrook Road, Lincoln, Middlesex County, Massachusetts.

33.     Muir is the President, Secretary, and Treasurer of Clover, as well as its Chief Operating Officer, and, upon information and belief, Muir is also the sole shareholder of Clover.

34.     The Defendant, Pileggi, is an individual residing at 24 Grand View Avenue, Apartment 2, Somerville, Middlesex County, Massachusetts, and she is the Director of Human Resources for Clover.

35.     The Defendant, Anderson, is an individual residing at 377 Commonwealth Road, Wayland, Middlesex County, Massachusetts, and he is the Director of Food for Clover.

## DESCRIPTION OF DEFENDANTS' BUSINESS

36.     Clover is in the business of food and beverage preparation and service; it operates seven (7) restaurants and four (4) food trucks or mobile restaurants, located or stationed in and around the greater-Boston and Cambridge areas of Massachusetts.

37.     Clover's Operations Department or "OPS" is located within one of Clover's restaurants -- specifically, the "HUB" restaurant, which is located at 1075 Cambridge Street, Cambridge, Middlesex County, Massachusetts ("the HUB Location").

38.     All of the ingredients; supplies; materials and the like are stored within the HUB Location, and Clover employs individuals within the "OPS Department" who are responsible for organizing and packing large containers with all of the ingredients; supplies, and materials needed for Clover's restaurants and food trucks to operate ("PACK persons").

39.     Clover also employs individuals as van drivers who are responsible for shuttling between the HUB location and the various restaurant locations in order to deliver the containers of ingredients; materials and supplies each and every day, and for retrieving from each restaurant all of the dirty food containers and receptacles, so that they can be washed and reused.

40.     Clover's van drivers are also responsible for retrieving ingredients, materials and supplies from the various vendors and suppliers engaged by Clover, some of which are located out of state.

41.     Clover also employs individuals as dishwashers who work within the OPS department at the HUB location of Clover, and who are responsible for washing all the containers, receptacles and dishes used in the operations of all of Clover's restaurants and food trucks.

42.     Clover hires or assigns an employee to work as the manager of each restaurant location; each food truck, and each department within Clover, including the OPS department, and, for some of the period at issue herein, Clover also hired or assigned another employee to work as the "team leader" for each department within Clover, including the OPS department.

## FACTUAL ALLEGATIONS

43.     In or around late-August, 2014, the Plaintiff, Brown, submitted an application to work for Clover, at which time he was residing in the Coolidge House Residential Re-Entry Center, located at 307 Huntington Street, Boston, Suffolk County, Massachusetts ("Coolidge House").

44.     The Coolidge House Residential Re-Entry Center is a facility, or halfway house, which provides housing and services to offenders from various Federal jurisdictions, including pre-release inmates, pre-trial detainees, direct court commitments and probationers. Coolidge House provides its residents with the services and support necessary to facilitate their reintegration back into the community upon their release, including vocational or job-placement. The Coolidge House is operated pursuant to an agreement with the Federal Bureau of Prisons ("the FBOP").

45.     Some of the other Plaintiffs, as well as several similarly situated current or former Clover employees, resided in the Coolidge House, or in similar residential re-entry facilities, at the time they submitted their applications for employment with Clover.

46.     Brown prepared and submitted his application for employment, after learning from Coolidge House personnel and residents that Clover regularly solicits (or then-solicited) employees from Coolidge House and other similar re-integration facilities.

47.     Clover solicits employees from Coolidge House and other similar re-entry facilities as part of a government-incentive program, which provides businesses and companies with substantial tax credits for hiring and training residents of the Coolidge House and other similar Federal Re-Entry Facilities.

48.     Clover hired Brown, on or about September 28, 2012, and initially assigned him to the role of "pack person" within the OPS Department, which is located in the rear of Clover's "HUB Location" at 1075 Cambridge Street, Cambridge, Middlesex County, Massachusetts.

49.     Clover's "pack person" position entails collecting, packing, and preparing Clover's delivery vans for their daily deliveries, distributions and pick-ups to and from each of seven restaurant locations, and for collecting packing and preparing each of Clover's four food trucks for their daily mobile service in and around Cambridge and Boston.

50.     During the entirety of Brown's employment at Clover, the OPS Department was predominantly, if not exclusively, staffed with individuals of color, and virtually all such individuals were African-American.

51.     Brown was initially compensated by Clover at the rate of $8.00 per hour, which was the standard starting rate paid to new Clover employees, pursuant to the version of the Clover Employee Handbook in effect at that time. A copy of this version of the Clover Employee Handbook is annexed hereto as **Exhibit A**.

52.     Shortly after he started working, Brown requested additional shifts or hours of work, and the Defendants assigned him to work as a window washer at the Harvard Square location of Clover for all such additional shifts. Despite giving Brown these additional responsibilities, and these two different titles, the Defendants continued to pay Brown at the introductory rate of $8.00 per hour.

53.     During the initial period of Brown's employment, the team leader for the OPS Department was one, Ashton Paine ("Paine"). As team leader, Paine was Brown's direct supervisor. Paine is Caucasian.

54.     At this time, the Defendant, Anderson, was the Manager of the OPS Department ("the OPS Manager"), and Paine's direct supervisor. Anderson is also a Caucasian male.

55.     As the OPS Manager, Anderson was paid a salary, which, in 2012, exceeded Eighty Three Thousand ($83,000.00) Dollars per year, plus bonuses. A copy of a Request for Verification of Employment, which Anderson submitted to Pileggi in connection with an application for a mortgage, and which reflects his salary information at that time, is annexed hereto as **Exhibit B**.

56.     In or around March of 2013, Anderson was promoted from the OPS Manager position, to Clover's Director of Food and Beverage.

57.     After Anderson was promoted, the Defendants promoted Brown to the position of OPS Manager, which was available as a result of Anderson's promotion.

58.     Brown continued in the role of OPS Manager from March, 2013, until he was terminated on August 28, 2014.

59.     When they promoted him to OPS Manager, the Defendants represented to Brown that he was to be paid at the higher hourly rate of $16.00 per hour. However, for the first several weeks of Brown's new management role, the Defendants failed to compensate him at the increased hourly rate, instead continuing to pay him the rate he was paid prior to his promotion.

60.     The Defendants told Brown he was to paid the higher hourly rate notwithstanding the fact that Clover's employee handbook at that time (as well as in all other versions thereof) provides that all restaurant, food truck, and department managers are to be paid on a salary basis.

61.     Throughout the entire period he worked as the OPS Manager, Brown was the only manager who was paid at an hourly rate. All other restaurant, food truck and/or department managers were paid on a salary basis, in accordance with Clover's Employee Handbook -- both the version in effect at that time, and all subsequent versions thereof.

62.     The salaries paid to all other restaurant, food truck and department managers amounted to significantly higher pay than the compensation paid to Brown, as the OPS Manager.

63.     Throughout the entire period during which Brown was the OPS Manager, he was the only restaurant, food truck, or department manager who was not eligible to receive the employment benefits described in the Employee Handbook, and for which all the other restaurant, food truck, and department managers were eligible.

64.     Throughout this entire period, Brown was the only restaurant, food truck, or department manager who was not permitted to attend the weekly manager meetings, and he was the only manager who was not invited nor permitted to attend the periodic manager activities, which included outings to Red Sox Games, restaurants and the like.

65.     Throughout this entire period, Brown was the only Black-American restaurant, food truck or department manager at Clover. At different times during Brown's tenure as OPS Manager, there were two restaurant or food truck managers of color. One such manager of color was from Barbados, and is thus Caribbean-American, and the other manager of color was from Cape Verde, Africa, and is thus African-American.

66.     Throughout this entire period, Brown was the only restaurant, food truck, or department manager who had been a resident at the Coolidge House or any other similar facility, or for whom Clover had otherwise received a tax credit or monetary incentive or benefit.

67.     While Brown was the OPS Manager, Brown was scheduled to work certain on-site shifts -- i.e., in the OPS Department at the HUB Location of Clover -- and he was also expected and required to be "on call" before and after each on-site shift, and at all hours of the day on any day he was not scheduled to work on-site.

68.     During such "on-call" hours, Brown regularly performed various work duties, including, without limitation, answering and making phone calls, sending and receiving e-mails, making and modifying the staff schedule for the OPS Department, and performing various other managerial and administrative tasks.

69.     Brown was only paid for those hours of work he performed during his on-site shifts, and he was not compensated for those hours of "on-call" work time. Brown was not paid a salary that included compensation for all hours of work he performed, and he thus performed several hours of work for which he was never compensated.

70.     While Brown was the OPS Manager, all the other restaurant, food truck and department managers at Clover were expected and required to perform only occasional work outside of their on-site shifts, and all such managers were paid an annual salary, which included their compensation for all such outside hours of work they performed.

71.     During the period that Brown was the OPS Manager, all department managers at Clover were supposed to be given access to and training for using the computer software program Clover used to record and track all employee' work hours -- i.e., the time-keeping program through which each employee would "clock-in" and "clock-out", at the start and finish of each work shift,

and which the Defendants submitted to their payroll company each week, so that it could generate and distribute the staff paychecks.

72.     Each of Clover's department managers were given this training and access to the time-keeping system, so that they could review and adjust the hours entered by the employees within their departments, before the close of each bi-weekly pay period, after which, Pileggi then compiled all of the information entered into this time-keeping program, and reported same to Clover's payroll company.

73.     At the outset of his employment, Brown reported the number of hours he had worked each day to the OPS team-leader at that time, Paine. Brown reported such information to Paine verbally or by email or text message.

74.     Upon Paine's departure from Clover, Pileggi instructed Brown to report his hours to the Defendant, Anderson, notwithstanding the fact that Brown had been promoted to the OPS Manager position, and therefore should have been given training and access to the time-keeping system, so that he could enter and adjust his own hours of work, as well as the hours entered/recorded by the other OPS Department employees.

75.     Shortly thereafter, Pileggi instructed Brown to stop reporting his hours and the hours of work performed by the other OPS Department employees to Anderson, and to, instead, report same to Pileggi, directly.

76.     At that point, until he was terminated, Brown reported his own and the other OPS Department employees' work-hours to Pileggi each week. After Brown reported same to her, Pileggi then entered the information into the time-keeping software program.

77.     Each and every pay-period during Brown's employment as the OPS Manager, after Brown reported the hours to Paine, Anderson and/or Pileggi, Pileggi would then make unilateral adjustments to the time-records, reducing the number of recorded hours of work pertaining to Brown; the OPS Department employees, and other Clover employees, prior to submitting the time-records to the payroll company.

78.     For more than ten (10) months after he was promoted to OPS Manager, Brown was the only restaurant, food truck or department manager who had not received training and did not have access to the time-keeping software program.

79.     In or around June, 2014, the Defendants finally trained Brown and gave him access to use the time-keeping software program, and he was then permitted to enter and adjust such information for himself and on behalf of his department's employees.

80.     However, even after receiving this training and access to the time-keeping program, Pileggi still required Brown to finish reviewing, entering, and adjusting his hours and those of the OPS Department staff before the close of each pay-period, so that Pileggi could perform a second review of the OPS Department time records, after which Pileggi routinely made further adjustments to the time-records pertaining to the OPS Department employees.

81.     For this and other reasons, the Defendants, through Pileggi, routinely erred in calculating each employee's total hours of work performed during each pay-period and/or regularly submitted inaccurate time-records to the payroll company.

82.     Throughout the time period relevant hereto, virtually every paycheck issued to the Plaintiffs reflected compensation for fewer hours than the actual total number of hours of work performed by them during the particular pay period.

83.     Throughout the time period relevant hereto, the Defendants further had no system in place for calculating and recording the overtime hours of work performed by each individual employee -- that is, there was no system in place for keeping track of the breakdown between regular hours and overtime hours of work performed by each employee.

84.     Throughout this period, the Defendants only paid employees at the overtime hourly rate (i.e., one and one-half the regular hourly rate), if the specific employee had worked more than eighty (80) hours within the two-week (or bi-weekly) pay period, as opposed to compensating employees at the overtime hourly rate for all hours of work performed in excess of forty (40) hours, during the particular work-week.

85.     At no time throughout the subject period, was there any written information posted inside any Clover location regarding the proper methods for keeping employee time-records;

14

maintaining personnel files; calculating and paying regular and overtime wages, or any other similar information.

86.     On May 6, 2014, Muir accused Brown of theft of Clover property/money, despite having no basis whatsoever for believing that Brown had been involved in the incident. A copy of the e-mail dated May 6, 2014, is annexed hereto as **Exhibit C**.

87.     In the May 6, 2014 email, Muir states blankly: "I ask that you turn over any cash you have from the theft and part ways with Clover."

88.     Muir sent the same or similar e-mails to other employees; however, he only sent such e-mails to Black or minority employees, and/or to those employees who Muir knows to have criminal records or histories.

89.     In response to the May 6, 2014 email, Brown not only proved to Muir that he was in no way involved in the theft, but also made a substantial effort to assist Muir with identifying the true culprit(s).

90.     The e-mail from Muir made Brown reasonably upset and distressed, and Brown continued to feel extremely uncomfortable as a result of the accusations for his remaining period of employment with Clover.

91.     In July of 2014, Brown informed Pileggi that the heat and lack of ventilation within the OPS department had become virtually unbearable for him and for the other OPS department employees, and were making it difficult to breathe while working. A copy of an email from Brown to Pileggi reporting the heat problem is annexed hereto as **Exhibit D**.

92.     Brown attached to this e-mail to Pileggi a photograph of the thermostat in the OPS Department which reflected that the temperature in the OPS Department was 92 degrees.

93.     In response to this e-mail, Pileggi made numerous comments to Brown about how he and the other OPS Department employees, all of whom at that time were Black or African-American, should be able to handle the excessive heat.

94.     Brown understood such comments to mean that Brown and his co-workers should be able to tolerate the hot working conditions, somehow because of their race.

95.     Neither Pileggi nor any other Defendant made any effort to rectify the heat and ventilation problems within the OPS department.

96.     In or around July of 2014, Brown verbally complained to Defendant Pileggi that: (1) he was not permitted to attend the manager meetings; (2) he was not accruing paid time off nor receiving any other benefits to which managers are supposed to be entitled, of which all other managers receive; (3) that he was expected to be available to work at all hours of the day, including responding to calls and emails, despite not being "on the clock" and not receiving deserved pay during such periods; and (4) that he had been receiving frequent complaints from other OPS Department employees regarding late payments of wages, nonpayment of regular and overtime wages and late or missing reimbursements to employees for out-of-pocket expenditures.

97.     On August 21, 2014, Defendant Pileggi delivered to Brown an "offer letter", wherein Defendant Clover offered Brown an annual salary of $25,000.00, to continue in his role as OPS Manager. A copy of the Offer Letter is attached hereto as **Exhibit E.**

98.     The salary offered to Brown, as reflected in the Offer Letter at Exhibit E, represented a substantial pay cut from the amount he was earning at that time.

99.     In the Offer Letter, Defendant Pileggi notes that the offer contemplated creating a "new" position at Clover, and that, within this role, Brown would report directly to Pileggi. However, neither the duties listed in the Offer Letter, nor the fact that Brown was to report to Pileggi, made the position being offered to Brown any different than the one he already held at that time.

100.     Brown reasonably declined the offer immediately, and instead informed Pileggi that he wished to continue in his same position at his hourly rate of pay.

101.     On or about August 22, 2014, Defendant Muir contacted Brown by telephone and urged Brown to accept the position from the Offer Letter.

102.     On August 25, 2014, Anderson scheduled a meeting with Brown to discuss the Offer Letter. Present at the meeting were Pileggi, Anderson and Brown.

103.     At the August 25, 2014 meeting Anderson and Pileggi again attempted to persuade Brown to accept the offer. Brown again declined, explaining that it would be unreasonable for him

to elect to take such a significant reduction in pay, while being expected and required to perform the same, if not more, duties and tasks than those which he was responsible for completing in his position as OPS Manager, at that time.

104.    During the meeting, Pileggi informed Brown that remaining in his current position was not an option, and explained that, if Brown declined the offer, he would only be permitted to continue working as OPS Manager, until Brown had hired and trained his own replacement.

105.    Pileggi stated to Brown that the person hired to replace Brown was to be offered the same $25,000 annual salary that was being offered to Brown, and that he or she was to be responsible for all of the same duties and tasks.

106.    During this meeting, Brown asked whether his departure from Clover, after hiring and training his replacement, was to be considered a termination or a voluntary departure from his employment.

107.    Pileggi explained that it would be deemed a voluntary departure, in response to which Brown explained that this would render him ineligible for unemployment benefits, and that Clover was therefore effectively forcing him to choose between a substantial pay-cut and becoming unemployed, without being eligible to collect unemployment, while he searched for new employment.

108.    As the meeting on August 25, 2014 progressed, Brown became reasonably upset and extremely anxious. By the conclusion of the meeting, Brown's anxiety had become so severe, he asked Pileggi and Anderson if he could leave to go to the emergency room, as he believed he was having a panic attack.

109.    After the meeting, Brown continued to communicate with the Defendants by both telephone and e-mail.

110.    On August 26, 2014, Anderson asked Brown what had happened in the emergency room, and he further inquired as to whether Brown wished to select his official last day of employment. Specifically, in an e-mail to Brown, Anderson stated as follows:

I also want to see if you are coming to work today or if the doctor recommends that you take the day off.  Please forward me any paperwork from the visit so we can make the right decision.

A copy of this e-mail, together with Brown's response thereto, is annexed hereto as **Exhibit F.**

111.    Brown immediately responded to Anderson, refusing to pick his own "last day", and explaining that it seemed more appropriate for Pileggi and Anderson to make that decision, as he did not want to leave his employment with Clover, and his departure was not voluntary. Specifically, Brown responds as follows:

As to ... my last day, I'm not going to answer this question. I will leave this up to you and Megan. As I explained yesterday during our conversation basically I didn't accept the offer for this role that you and Megan presented because it was less money for a role with all of the duties that I am currently performing and have been performing on a regular basis for the past 11 months or more for less money than I am being paid now.

See, Exhibit F hereto.

112.    At no time prior to, during, or after the August 25, 2014 meeting did Brown represent to the Defendants that he no longer wished to work for Clover; that he did not want to continue in the role as OPS Manager, or that he intended to quit if the Defendants did not increase his compensation.

113.    During the meeting on August 25, 2014, both Pileggi and Anderson made numerous representations to Brown about continuing his employment until he had hired and trained his replacement. Nothing stated during the meeting, or at any time immediately thereafter, led Brown to believe that he was being terminated at that time.

114.    The day after the meeting -- August 26, 2014 -- Brown received a voice mail message from Anderson in which Anderson inquires as to Brown's health issues and communicates his hope that Brown's departure from Clover will be amicable.

115.    On August 28, 2014, Brown received an e-mail from Pileggi informing Brown that he had been terminated from his employment with Clover. A copy of the termination e-mail is annexed hereto as **Exhibit G.**

116.    Pileggi arranged to have Brown's final paycheck delivered to him at his home that same day. A copy of said final paycheck is annexed hereto as **Exhibit H.**

117.    Brown's final paycheck is dated August 27, 2014, despite the fact that he did not receive it, nor any notice of his termination, until August 28, 2014.

118.    In the termination letter, Pileggi alleges that the basis for terminating Mr. Brown was that he had made "explicit threats in a meeting with Christopher Anderson and Megan Pileggi on Monday 8/25/14."

119.    Brown made no threats of any kind whatsoever during the August 25, 2014 meeting, and Brown learned for the first time that the Defendants were alleging he had done so, and that he was being terminated as a result of such allegation, when he received the termination letter on August 28, 2014.

120.    Anderson contacted Brown more than once *after* the August 25, 2014 meeting and during said communications discussed Brown's continued employment at Clover.

121.    Clover had no plan to terminate Brown immediately after the August 25, 2014 meeting.

122.    The Defendants maintain a list of each Clover employee who is terminated, together with a description of the basis for or incident which resulted in that employee's termination ("Termination List"). A copy of the Termination List is annexed hereto as **Exhibit I**.

123.    In the termination list at Exhibit I, Brown is the <u>only</u> employee for whom there is no information provided as to the reason for his termination. The space next to Brown's name is simply blank.

124.    For the two days following the August 25, 2014 meeting, Brown continued to communicate with Pileggi, Anderson, and Muir, via e-mail and telephone, regarding his health and other work-related matters. Throughout this time, Clover made no mention of any so-called threats made by Brown during the meeting, or of any intention to terminate Brown as a result thereof.

125.    Brown was shocked and insulted that Muir, Pileggi and Anderson would fabricate such an outrageous basis for his termination, especially one that attacked his character and which could have resulted in serious consequences in light of his past involvement with the criminal justice system.

*126.* Brown was so confused by Clover's decision that he first thought his termination had been motivated by his refusal -- on HIPAA grounds -- to provide Anderson with a copy of his medical records pertaining to his visit to the ER on August 25, 2014.

*127.* In an e-mail to Anderson dated August 28, 2014, Brown states as follows:

Hi Chris. I sent you a copy of my doctor's letter yesterday evening. Is this why I am being fired today?

A copy of this email is annexed hereto as **Exhibit J**.

128. On August 27, 2014, Defendants Clover and Pileggi filed a police report concerning the alleged threats purportedly made by Brown. A copy of this Police Report is annexed hereto as **Exhibit K.**

129. The Police Report falsely alleges that at some time during the period from August 22, 2014 to August 25, 2014, Brown said, "You'll be sorry," directed towards Pileggi or Clover. (See Exhibit K)

130. Brown did not state to Pileggi, nor to anyone else, that she or anyone else "would be sorry", nor did he make any other similar statement at any time during his period of employment.

131. The police report further provides that Clover was visited by representatives of various government agencies who informed Clover that they were commencing investigations in response to complaints filed by a Clover employee.

132. Clover did not file the police report until several days after Brown allegedly made the threatening statement.

133. The Police Report further alleges that one of Clover's van had recently been vandalized, suggesting that Brown was responsible therefor. (See Exhibit K)

134. Brown had no involvement whatsoever in the alleged vandalism of Defendant Clover's personal property, and all three Managers -- Pileggi, Muir and Anderson -- knew that Brown was not involved.

135. Brown was never charged with any of the crimes Clover's managers alleged he committed in the Police Report.

136.    At the time of the August 25, 2014 meeting, Brown had been preparing to file claims against Clover with the wage and hour division of the U.S. Department of Labor; the wage and hour division of the Attorney General; the EEOC, and he had already reported violations of the health and safety regulations to OSHA and the Massachusetts Board of Health.

137.    Defendant Clover's true motivation for Brown's termination was that he had taken several measures to address, correct and improve various practices and issues at Clover. These efforts include, but are not limited to, filing complaints with (a) the EEOC; (b) the wage and hour division of the Attorney General's Office; (c) the wage and hour division of the U.S. Department of Labor; and (d) the OSHA division of the U.S. Department of Labor and the State Board of Health.

138.    The OSHA complaint, filed by Brown on or about August 22, 2014, three days prior to his meeting with Muir and Pileggi, specifically reported Clover's several violations of the laws and regulations relative to the health and safety conditions within workplaces, which violations had rendered the OPS Department virtually intolerable during the summer of 2014.

139.    The OSHA complaint highlighted Clover's violations including a long-standing rodent/infestation problem within the OPS department, a pervasive mold problem in and throughout the walk-in refrigerators and the unbearable heat and lack of proper ventilation in and throughout the OPS Department, which Clover had continuously refused or failed to address, despite Brown's repeated requests to them that they do so.

140.    On or about August 25, 2014, the Board of Health arrived at Clover to conduct its initial inspection.

141.    On or about August 26, 2014, Brown provided additional information to the Board of Health, including photographs of the mold, mouse/rat droppings throughout the premises and a video of a mouse running around the OPS area.

142.    On or about August 27, 2014, OSHA notified Clover of an employee complaint regarding substandard conditions.  A copy of the OSHA Letter is annexed hereto as **Exhibit L.**

143.    The OSHA Letter explains that a representative of OSHA had contacted Pileggi by telephone that same day as the representative had prepared and sent the letter, August 27, 2014.

144.    August 27, 2014 is the very same date as Brown's final paycheck, as well as the police report which the Defendants filed against Brown, and which contains fabricated allegations.

145.    Clover did not plan to terminate Brown until August 25, 2014, the very same day that Pileggi learned that Brown had filed an OSHA Complaint against Clover, as well as after the date of the Board of Health Complaint.

146.    The August 26, 2014 Internal Employee Incident Report that Pileggi entered makes absolutely no mention of any "threat" by Brown. Instead, it states simply: "[h]ad a talk with [R]obert about his role with Clover on 8.25. [H]e agreed to stay in role and get back to us on a timeline for his departure...he left citing he was upset and needed to seek professional help due to stress on the job..." The August 26, 2014 Internal Employee Incident Report is attached hereto as **Exhibit M.**

147.    The information set forth at the bottom of the August 26, 2014 Internal Employee Incident Report reflects that it was last edited on August 26, 2014.

148.    Thereafter, the Defendants prepared an additional Internal Employee Incident Report concerning the events with Brown, which is dated August 28, 2014 -- i.e., the date upon which Brown was notified of his termination, and which was immediately after Clover learned of the OSHA/BOH complaints on August 27, 2014. A copy of the August 28, 2014 Internal Employee Incident Report is attached hereto as **Exhibit N.**

149.    In stark contrast to the August 26, 2014 Incident Report, the August 28, 2014 Incident Report reflects that it was last edited/updated on November 4, 2014. All other known Employee Incident Reports are dated and updated simultaneously. The August 28/November 4, 2014 report is the only report that contains any reference to Brown's alleged threat, and it is the only report that was edited after Clover received notice that Brown had filed the various complaints against them.

150.    The August 28/November 4, 2014 Incident Report was altered well after Brown's termination, and after Brown's various government-agency complaints were filed, and the investigations related thereto had been commenced.

151.    After Brown's termination, Pileggi offered Brown's position to the Plaintiff-Robinson. Robinson started at Clover shortly before Brown started working for Clover, and, since that time worked, Robinson had worked as a dishwasher in the OPS Department. When Pileggi offered Robinson the OPS manager position, she told him that he was to be compensated on an hourly basis, at the rate of $11.25 per hour. This was substantially less than Brown had been paid for the same work.

152.    Robinson declined the offer, and joined Brown in the filing of his complaints with the EEOC and MCAD.

153.    Just one or two weeks after Robinson declined the offer, the Defendants assigned one of its employees, Marina Weisz ("Weisz"), to work as the new OPS Manager. In her new role, Weisz was paid an annual salary; she was immediately required to attend the weekly manager meetings; was eligible to receive the management employee benefits, and she was invited to all of the manager activities and outings.

154.    Weisz is a Caucasian female.

155.    Weisz had no experience in the food service/restaurant business prior to being hired by Clover, and she had no management experience, nor any experience similar to the work performed in the OPS department, prior to her promotion to OPS manager.

156.    Weisz first applied to Clover for a position as a dishwasher, and it was Brown who conducted her interview on behalf of Clover, and supervised her initial one-hour training shift.

157.    After his termination, Brown filed a Complaint with the whistleblower department of OSHA, alleging that he had been terminated in retaliation for reporting the health and safety violations within the OPS Department to OSHA and the state Board of Health. A copy of the Whistleblower Complaint, and the exhibits thereto, are annexed hereto as **Exhibit O.**

## COUNT I
## VIOLATIONS OF THE FAIR LABOR STANDARDS ACT - 29 U.S.C. §§ 206(a)(1), (b)
## FAILURE TO PAY REGULAR-TIME WAGES
(All Plaintiffs v. All Defendants)

158.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-157.

159.    Clover failed to pay the Plaintiffs for every hour worked.

160.    Clover routinely altered or modified hours entered by the department managers, thereby directing the payroll company to pay the Plaintiffs for less than their total hours actually worked.

161.    Clover improperly deducted wages from the salaries of the Plaintiffs for uniforms.

162.    The Plaintiffs have been injured by such actions of the Defendants.

163.    The Plaintiffs have a private right of action to bring this claim.

WHEREFORE, the Plaintiffs request that the Court award statutory damages, punitive damages, reasonable attorney's fees and costs pursuant to 29 U.S.C. § 216(b) and order any other or further relief as the Court may deem just and proper.

### COUNT II
### VIOLATIONS OF THE MASSACHUSETTS WAGE ACT - M.G.L. c. 148, §§149,150
### FAILURE TO PAY REGULAR-TIME WAGES
(All Plaintiffs v. All Defendants)

164.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-163.

165.    Clover failed to pay the Plaintiffs for every hour worked.

166.    Clover routinely altered or modified hours entered by the department managers, thereby directing the payroll company to pay the Plaintiffs for less than their total hours actually worked.

167.    Clover improperly deducted wages from the salaries of the Plaintiffs for uniforms.

168.    The Plaintiffs have been injured by such actions of the Defendants.

169.    The Plaintiffs have a private right of action to bring this claim.

WHEREFORE, the Plaintiffs request that the Court award statutory damages, punitive damages, reasonable attorney's fees and costs pursuant to M.G.L. c. 149, §150 and order any other or further relief as the Court may deem just and proper.

### COUNT III
### VIOLATIONS OF THE FAIR LABOR STANDARDS ACT - 29 U.S.C. §§ 207(a)  216(B)
### FAILURE TO PAY OVERTIME WAGES
(All Plaintiffs v. All Defendants)

170.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-169.

171.    Defendants failed to pay the Plaintiffs for every hour worked including overtime hours.

172.    Defendants violated 29 U.S.C. § 207(a) by failing to pay Plaintiffs overtime compensation at one-and-a-half times the regular hourly rate for hours worked in excess of 40 hours per week.

173.    Clover routinely altered or modified hours entered by the department managers, thereby directing the payroll company to pay the Plaintiffs for less than their total hours actually worked.

174.    Defendants' violations of 29 U.S.C. § 207(a) were repeated, willful and intentional.

175.    Plaintiffs have been damaged by these violations of 29 U.S.C. § 207(a).

WHEREFORE, the Plaintiffs request that the Court award statutory damages, punitive damages, reasonable attorney's fees and costs pursuant to 29 U.S.C. § 216(b) and order any other or further relief as the Court may deem just and proper.

**COUNT IV**
**VIOLATIONS OF THE MASSACHUSETTS WAGE ACT - M.G.L. c. 148, §149**
**FAILURE TO PAY OVERTIME WAGES**
(All Plaintiffs v. All Defendants)

176.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-175.

177.    Defendants violated M.G.L. c. 148, § 149 by failing to pay Plaintiffs overtime compensation at one-and-a-half times the regular hourly rate for hours worked in excess of 40 hours per week.

178.    Clover routinely altered or modified hours entered by the department managers, thereby directing the payroll company to pay the Plaintiffs for less than their total hours actually worked.

179.    Defendants' violations of M.G.L. c. 148, § 149 were repeated, willful and intentional.

180.    Plaintiffs have been damaged by these violations of M.G.L. c. 148, § 149.

WHEREFORE, the Plaintiffs request that the Court to award statutory damages, punitive damages, reasonable attorneys' fees and costs and order any other or further relief as the Court may deem just and proper.

## COUNT V
## VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT
## 42 USC § 2000e-2(a)(1); 42 USC § 2000e-2(a)(2), and 2000e-2(m)
## DISPARATE TREATMENT DISCRIMINATION
(All Plaintiffs v. All Defendants)

181.   Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-180.

182.   The Plaintiffs are all a part of a protected class, including race, origin and national ethnicity.

183.   The Defendants treated the Plaintiffs differently than other individuals, employees or otherwise because of their protected class status.

184.   The Defendants' actions are violations of 42 USC § 2000e-2(a)(1); 42 USC § 2000e-2(a)(2), and 2000e-2(m) and were done so repeatedly, willfully and intentionally.

185.   Plaintiffs have been damaged by these violations.

WHEREFORE, the Plaintiffs request that this Court issue an award for emotional damages, punitive damages, actual damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

## COUNT VI
## VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT
## 42 USC § 2000e-2(k)(1)(a)(i) and 42 USC § 2000e-2(k)(1)(a)(ii)
## DISPARATE IMPACT DISCRIMINATION
(All Plaintiffs v. All Defendants)

186.   Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-185.

187.   The Plaintiffs are all a part of a protected class, including race, origin and national ethnicity.

188.   The Defendants treated the Plaintiffs differently than other individuals, employees or otherwise because of their protected class status.

189. The Defendants were impacted differently than other individuals, employees or otherwise because of their protected class status.

190. The Defendants' actions are violations of 42 USC § 2000e-2(k)(1)(a)(i)-(ii) and were done so repeatedly, willfully and intentionally.

191. Plaintiffs have been damaged by these violations.

WHEREFORE, the Plaintiffs request that this Court issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

## COUNT VII
## VIOLATIONS OF M.G.L. c. 151B, § 4(1)
## DISPARATE TREATMENT AND DISPARATE IMPACT DISCRIMINATION
### (All Plaintiffs v. All Defendants)

192. Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-191.

193. Pursuant to M.G.L. c. 151B § 4(1): "[i]t shall be an unlawful practice: ... For an employer, by himself or his agent, because of the race, color, religious creed, national origin ... to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification."

194. As detailed above, the Defendants' actions discriminated against all Plaintiffs in compensation, terms, conditions and privileges without a bona fide occupational qualification, in violation of M.G.L. c. 151B § 4(1).

195. The Plaintiffs have been damages by these violations.

WHEREFORE, the Plaintiffs request that this Court issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

## COUNT VIII
## VIOLATION OF M.G.L. c. 12 § 11I
### (All Plaintiffs v. All Defendants)

196.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-195.

197.    Clover discharged Brown because of his race, color, national origin, genetic information, or ancestry.

198.    Clover, Muir, Anderson and Pileggi discriminated against the Plaintiffs, in terms of compensation and in terms, conditions or privileges of their employment with Clover, because of their race, color, national origin, genetic information, or ancestry.

199.    The above actions of the Defendants are in violation of M.G.L. ch. 12 § 11I.

200.    The Plaintiffs have been injured by such actions of the Defendants.

WHEREFORE, the Plaintiffs request that this Court, pursuant to M.G.L. c. 12 *et seq.*, issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

## COUNT IX
## VIOLATION OF 42 U.S.C. §§ 1981 AND 1983
### Fourteenth Amendment
(All Plaintiffs v. All Defendants)

201.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-200.

202.    42 U.S.C. § 1983 provides as follows:

Civil action for deprivation of rights: Every person who, under color of any statute, ordinance, regulation, custom or usage of any State...subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights... secured by the Constitution and laws, shall be liable to the party injured in an action...for redress.

203.    The Fourteenth Amendment guarantees all persons the "equal protection of the laws."

204.    42 U.S.C. § 1983 provides as follows:

Equal rights under the law: (a) Statement of equal rights: All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed

by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

205.     The Plaintiffs were denied the equal protection of laws guaranteed by the Fourteenth Amendment.

206.     The Plaintiffs have been injured by such actions of the Defendants.

WHEREFORE, the Plaintiffs request that the Court award punitive damages, emotional-distress damages, reasonable attorneys' fees and costs and order any other or further relief as the Court may deem just and proper.

## COUNT X
## VIOLATIONS OF M.G.L. c. 151B, § 4(5)
## AIDING AND ABETTING EMPLOYMENT DISCRIMINATION
(All Plaintiffs v. Pileggi, Muir and Anderson)

207.     Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-206.

208.     Pursuant to M.G.L. c. 151B § 4(5) "[i]t shall be an unlawful practice: [...] (5) For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so."

209.     Defendants Pileggi, Muir and Anderson each individually aided, abetted, incited, compelled or coerced the acts forbidden under M.G.L. c. 151B.

210.     The Plaintiffs have been damages by these violations.

WHEREFORE, the Plaintiffs request that this Court issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

## COUNT XI
## FAILURE TO MAINTAIN PERSONNEL RECORDS
## IN VIOLATION OF 29 U.S.C. 211(c) AND M.G.L. c. 148, §52C:
(All Plaintiffs v. All Defendants)

211.     Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-210.

212.    Pursuant to 29 U.S.C. c. 211(c), 29 CFR §516.2, and M.G.L. c. 148 §52C, Clover is required to make, keep, and preserve records of the persons employed by them and of the wages, hours and other conditions and practices of employment maintained by them, and shall preserve such records.

213.    Clover failed to preserve and maintain the personnel records of the Plaintiffs.

214.    The Plaintiffs have been injured by such actions of the Defendants.

WHEREFORE, the Plaintiffs request that this Court, pursuant to 29 CFR §516.2 and M.G.L. c. 148 § 52C, issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

## COUNT XII
## FAILURE TO COMPLY WITH POSTING REQUIREMENTS
## IN VIOLATION OF  29 CFR §516.4  AND M.G.L. c. 149, §185(g)
(All Plaintiffs v. All Defendants)

215.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-214.

216.    Pursuant to 29 CFR § 516.3 and M.G.L. c. 149 § 185(g), Clover is required to "conspicuously display notices reasonably designed to inform its employees of their protection and obligations under this section, and use other appropriate means to keep its employees so informed. Each notice posted pursuant to this subsection shall include the name of the person or persons the employer has designated to receive written notifications pursuant to subsection (c)."

217.    Clover failed to do so.

218.    The Plaintiffs have been injured by such actions of the Defendants.

WHEREFORE, the Plaintiffs request that this Court, pursuant to 29 CFR §516.2 and M.G.L. c. 148 § 52C, issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

## COUNT XIII
## VIOLATION OF OCCUPATIONAL SAFETY AND HEALTH ACT
## 29 U.S.C. § 660(c) and 29 C.F.R. 24.102)
### (All Plaintiffs v. All Defendants)

219.  Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-218.

220.  Pursuant to the Occupational Safety and Health Act (OSHA), the Defendants were required to provide a safe workplace, free of known dangers, but they failed to do so.

221.  The Plaintiffs have been injured by such actions of the Defendants.

WHEREFORE, the Plaintiffs request that this Court, pursuant to the Occupational Safety and Health Act, issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

## COUNT XIV
## VIOLATION OF M.G.L. c. 148, §149A
## Retaliatory Termination of Robert Brown for Complaining about Compensation Practices
### (Brown v. All Defendants)

222.  Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-221

223.  The Defendants willfully terminated Brown in retaliation for Brown's complaints about the Defendants, individually, and collectively, and their compensation practices.

224.  Such actions are a violation of M.G.L. c. 148, § 149A.

225.  Brown was damaged by the actions of the Defendants.

WHEREFORE, Brown requests that this Court, pursuant to M.G.L. c. 148 § 27 *et seq.*, issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

## COUNT XV
## VIOLATIONS OF 29 USC § 660(C)(1), 29 C.F.R. 24.102 AND 29 USC § 218
## RETALIATORY TERMINATION OF ROBERT BROWN FOR
## REPORTING HEALTH AND SAFETY VIOLATIONS
### (Brown v. All Defendants)

226.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-225.

227.    Defendants violated 29 C.F.R. 24.102 by discharging or otherwise retaliating against the Plaintiff Brown for making internal and external complaints about the Defendants' violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. 660, et. seq. and for commencing or causing to be commenced, or is about to commence or cause to be commenced, a proceeding under one of the statutes listed in §24.100(a) or a proceeding for the administration or enforcement of any requirement imposed under such statute.

228.    Defendants violated 29 U.S.C. § 660(c) by discharging or otherwise retaliating against the Plaintiff Brown for making internal and external complaints about the Defendants' violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. 660, et. seq. and for commencing or causing to be commenced, or is about to commence or cause to be commenced, a proceeding under one of the statutes listed in §24.100(a) or a proceeding for the administration or enforcement of any requirement imposed under such statute.

229.    Defendants violated 29 USC § 218 *et seq.* by discharging or otherwise retaliating against the Plaintiff Brown for making internal and external complaints about the Defendants' violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. 660, et. seq. and for commencing or causing to be commenced, or is about to commence or cause to be commenced, a proceeding under one of the statutes listed in §24.100(a) or a proceeding for the administration or enforcement of any requirement imposed under such statute.

230.    The Defendants willfully terminated Brown in retaliation for Brown's complaints about the Defendants, individually, and collectively, and their violations of health and safety standards.

231.    Such actions are a violation of 29 U.S.C. § 660(C)(1), 29 U.S.C. § 218 *et seq.* and 29 C.F.R. 24.102.

232.    Brown was damaged by the actions of the Defendants.

WHEREFORE, Brown requests that this Court, pursuant to 29 U.S.C. § 660(C)(1), 29 C.F.R. 24.102 and 29 U.S.C. § 218 *et seq.*, issue an award for emotional damages, punitive

damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

**COUNT XVI**
**VIOLATIONS OF M.G.L. c. 148, § 185**
**RETALIATORY TERMINATION OF ROBERT BROWN FOR**
**REPORTING HEALTH AND SAFETY VIOLATIONS**
(Brown v. All Defendants)

233.     Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-232.

234.     The Defendants willfully terminated Brown in retaliation for Brown's complaints about the Defendants, individually, and collectively, and their violations of health and safety standards.

235.     Such actions are a violation of M.G.L. c. 148, § 185.

236.     Brown was damaged by the actions of the Defendants.

WHEREFORE, Brown requests that this Court, pursuant to M.G.L. c. 148, §185, issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

**COUNT XVII**
**RETALIATORY TERMINATION IN VIOLATION OF THE**
**FAIR LABOR STANDARDS ACT (29 U.S.C. § 215(a)(3))**
(Brown v. All Defendants)

237.     Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-236.

238.     The Defendants willfully terminated Brown in retaliation for Brown's protected activities, as further detailed herein.

239.     Such actions are a violation of the Fair Labor Standards Act, 29 U.SC. § 215(a)(3).

240.     Brown was damaged by the actions of the Defendants.

WHEREFORE, Brown requests that this Court, pursuant to 29 U.SC. § 215-218 issue an award for emotional damages, punitive damages, actual damages, statutory damages and award

costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

## COUNT XVIII
## VIOLATIONS 29 USC § 215 (a) and 29 USC § 218(c)
## Retaliatory Termination of Robert Brown for Complaining About Compensation Practices
(Brown v. All Defendants)

241.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-240.

242.    The Defendants willfully terminated Brown in retaliation for Brown's protected activities, as further detailed herein.

243.    Such actions are a violation of the Fair Labor Standards Act, 29 U.SC. § 215(a)(3).

244.    Brown was damaged by the actions of the Defendants.

WHEREFORE, Brown requests that this Court, pursuant to 29 U.SC. § 215-218 issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

## COUNT XIX
## DEFAMATION
(Brown v. All Defendants)

245.    Plaintiff hereby repeats and incorporates the allegations made in Paragraphs 1-244.

246.    Statements made by Defendants Pileggi and Clover in the August 27, 2014 Police Report were false.

247.    Specifically, Brown did not threaten anyone during the meeting, and had nothing to do with the alleged vandalism of a Clover vehicle.

248.    Defendants Pileggi and Clover knew the statements were false at the time of the Police Report.

249.    Further, there is no justifiable cause for asserting that Brown having contacted OSHA is a criminal matter.

250.    The Plaintiff Brown has been injured by the false Police Report, including, but not limited to, having been fired for false reasons, and his reputation has been injured among previous co-workers, family and friends.

WHEREFORE, the Plaintiff Brown requests that the Court award him punitive damages, emotional-distress damages, reasonable attorneys' fees and costs and order any other or further relief as the Court may deem just and proper.

**COUNT XX**
**VIOLATION OF M.G.L. c. 148, §149A**
**RETALIATORY TERMINATION OF RAYMOND ROBINSON FOR**
**COMPLAINING ABOUT COMPENSATION PRACTICES**
(Robinson v. All Defendants)

251.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-250.

252.    The Defendants willfully terminated Robinson in retaliation for Robinson's complaints about the Defendants, individually, and collectively, and their compensation practices.

253.    Such actions are a violation of M.G.L. c. 148, § 149A.

254.    Robinson was damaged by the actions of the Defendants.

WHEREFORE, Robinson requests that this Court, pursuant to M.G.L. c. 148 § 27 *et seq.*, issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

**COUNT XXI**
**RETALIATORY TERMINATION IN VIOLATION OF THE**
**FAIR LABOR STANDARDS ACT (29 U.S.C. § 215(a)(3))**
(Robinson v. All Defendants)

255.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-205.

256.    The Defendants willfully terminated Robinson in retaliation for Robinson's protected activities, as further detailed herein.

257.    Such actions are a violation of the Fair Labor Standards Act, 29 U.SC. § 215(a)(3).

258.    Robinson was damaged by the actions of the Defendants.

WHEREFORE, Robinson requests that this Court, pursuant to 29 U.SC. § 215 *et seq.*, issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

### COUNT XXII
### VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT
### 42 USC § 2000e-2(a)(1); 42 USC § 2000e-2(a)(2), and 2000e-2(m)
### DISPARATE TREATMENT DISCRIMINATION
(Robinson v. All Defendants)

259.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-258.

260.    The Plaintiff Robinson is a member of a protected class, including race, origin and national ethnicity.

261.    The Defendants treated Robinson differently than other individuals, employees or otherwise because of his protected class status.

262.    The Defendants' actions are violations of 42 USC § 2000e-2(a)(1); 42 USC § 2000e-2(a)(2), and 2000e-2(m) and were done so repeatedly, willfully and intentionally.

263.    Robinson has been damaged by these violations.

WHEREFORE, the Plaintiffs request that this Court issue an award for emotional damages, punitive damages, actual damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

### COUNT XXIII
### VIOLATIONS OF M.G.L. c. 151B, § 4(1)
### DISPARATE TREATMENT AND DISPARATE IMPACT DISCRIMINATION
(Robinson v. All Defendants)

264.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-263.

265.    Robinson is a member of a protected class, including race, origin and national ethnicity.

266.    The Defendants treated the Plaintiffs differently than other individuals, employees or otherwise because of their protected class status.

267.    Robinson was impacted differently than other individuals, employees or otherwise because of their protected class status.

268.    The Defendants' actions are violations of M.G.L. c. 151B, § 4(1) and were done so repeatedly, willfully and intentionally.

269.    Robinson has been damaged by these violations.

WHEREFORE, Plaintiff Robinson requests that this Court issue an award for emotional damages, punitive damages, actual damages, statutory damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

**COUNT XXIV**
**VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT**
**42 USC § 2000e-2(k)(1)(a)(i) and 42 USC § 2000e-2(k)(1)(a)(ii)**
**DISPARATE IMPACT DISCRIMINATION**
(Robinson v. All Defendants)

270.    Plaintiffs hereby repeat and incorporate the allegations made in Paragraphs 1-269.

271.    The Plaintiff Robinson is a member of a protected class, including race, origin and national ethnicity.

272.    The Defendants treated Robinson differently than other individuals, employees or otherwise because of his protected class status.

273.    The Defendants' actions are violations of 42 USC § 2000e-2(k)(l)(a)(i) and (ii) and were done so repeatedly, willfully and intentionally.

274.    Robinson has been damaged by these violations.

WHEREFORE, the Plaintiffs request that this Court issue an award for emotional damages, punitive damages, actual damages and award costs and reasonable attorneys' fees and order any other or further relief as the Court may deem just and proper.

**THE PLAINTIFFS DEMAND A TRIAL BY JURY.**

ROBERT BROWN, *et al.* and all other
similarly situated individuals.
By their attorneys,

_____
Rebecca H. Newman, BBO # 682392
Anthony T. Panebianco, BBO# 664556
NEWMAN & NEWMAN, P.C.
One McKinley Square
Boston, MA   02109
Tel: (617) 227-3361
Fax: (617) 723-1710
rnewman@newmanlegal.com
apanebianco@newmanlegal.com

DATED:        March 22, 2016

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

ROBERT BROWN, III, RAYMOND B. ROBINSON, JR.,
VICTOR LAGOMBRA, NORRIS DOUGLAS,
EKILISANDRO TEIXEIRA, CRAIG C. NELSON,
ANDERSON BUCKMIRE, RASHEED HALL,
ANTHONY DINGLE-JONES, BATRON SULLIVAN,
HENRY CLAY, TIMOTHY BROWN, JAMES
COAKLEY, KASHIF BROWN, SHAWN BROWN,
MARC C. HOLLAND, SHAWN ANDREWS, TROY
JOHNSON, MICHAEL E. COOPER, KARIM BLOUNT,
*INDIVIDUALLY, AND ON BEHALF OF ALL OTHER*
*SIMILARLY SITUATED INDIVIDUALS,*

    *Plaintiffs,*

v.

CLOVER FAST FOOD, INC., (d/b/a and a/k/a CLOVER
FOOD LABS), AYR MUIR, MEGAN PILEGGI f/k/a
MEGAN PEDERSON, AND CHRISTOPHER ANDERSON

    *Defendants.*

## VERIFICATION

    I, ROBERT BROWN, III, having first been duly sworn, state that I am one of the Plaintiffs named in the within Verified Complaint; I have read and understood each and every allegation set forth herein, and I hereby state that all such allegations are true and accurate to the best of my personal knowledge, except for those stated to be upon information and belief, and, as to those, I believe them to be true.

    Signed under the pains and penalties of perjury this 22 day of March, 2016.

                                  *Robert Brown III*
                                  ROBERT BROWN, III